Filed 3/2/15

# IN THE SUPREME COURT OF CALIFORNIA

| | | |
|---|---|---|
| THE PEOPLE, | ) | |
| | ) | |
| Plaintiff and Respondent, | ) | |
| | ) | S187965 |
| v. | ) | |
| | ) | Ct.App. 4/3 G038379 |
| STEVEN LLOYD MOSLEY, | ) | |
| | ) | Orange County |
| Defendant and Appellant. | ) | Super. Ct. No. 05NF4105 |
| _____ | ) | |

We confront a single, narrow issue. *Apprendi v. New Jersey* (2000) 530 U.S. 466 (*Apprendi*) held that the Sixth Amendment generally requires a *jury* to find "any fact that increases the *penalty for a crime* beyond the prescribed statutory maximum." (*Id.*, at p. 490, italics added.) If a *judge* makes the findings underlying his or her discretionary order that a convicted criminal defendant must register as a sex offender, is the order invalid under *Apprendi* insofar as it includes registered sex offender *residency restrictions* imposed by Proposition 83, the Sexual Predator Punishment and Control Act: Jessica's Law (Prop. 83, as approved by voters, Gen. Elec. (Nov. 7, 2006), hereafter Proposition 83 or Jessica's Law)? We conclude the answer is no.

California law has long required persons convicted of certain specified sex crimes, including commission of a lewd act on a child under 14 (Pen. Code, § 288,

subd. (a) (section 288(a))[1] to register as sex offenders as long as they live or work in California. (§ 290, subds. (b), (c).) If the conviction is for an offense other than those automatically requiring registration, the court may nonetheless exercise its discretion to impose a registration requirement if the court finds the offense was sexually motivated or compelled, and that registration is justified by the defendant's risk of reoffense. (§ 290.006; see *People v. Garcia* (2008) 161 Cal.App.4th 475, 485; cf., *People v. Hofsheier* (2006) 37 Cal.4th 1185, 1196-1197 (*Hofsheier*), overruled on other grounds, *Johnson v. Cal. Dept. of Justice* (Jan. 29, 2015, S20916) ___ Cal.4th ___.)

On November 7, 2006, the voters enacted Proposition 83. Among other things, the initiative measure sought to create "predator free zones around schools and parks to prevent sex offenders from living near where our children learn and play." (Ballot Pamp., Gen. Elec. (Nov. 7, 2006) (Ballot Pamphlet) argument in favor of Prop. 83, p. 46, italics and capitalization omitted.) To this end, Proposition 83 added new subdivision (b) to an existing statute, Penal Code section 3003.5.

Prior to Proposition 83, section 3003.5, codified among laws dealing with parole, had limited the rights of parolee sex offender registrants, while on parole, to live with other registered sex offenders. (*Id.*, subd. (a).) As added by the initiative measure, subdivision (b) of section 3003.5 (hereafter section 3003.5(b)) declares: "Notwithstanding any other provision of law, it is unlawful for *any person* for whom registration [as a sex offender] is required . . . to reside within 2000 feet of any public or private school, or park where children regularly gather." (Italics added.)

---

[1] All subsequent unlabeled statutory references are to the Penal Code.

Here, defendant's 2003 conduct with a 12-year-old girl led to a charge he committed a lewd act on a child under 14. In a 2007 trial, the jury acquitted him of that crime, but convicted him of the lesser misdemeanor offense of simple assault. At sentencing, the court exercised its discretion to order him to register as a sex offender. To support this action, the court found, as specified in section 290.006, that the assault was committed "as a result of sexual compulsion or for purposes of sexual gratification." The court further determined that defendant was physically dangerous to the public, at serious risk to reoffend, and not being treated for his sexual compulsion.

The Court of Appeal accepted defendant's argument that the registration order is invalid under *Apprendi* because the trial judge, and not a jury, made the predicate factual findings. The appellate court was persuaded by well-settled authority that a requirement to register as a sex offender is not, in and of itself, a criminal penalty, or punishment, for the conviction that led to imposition of the requirement. But the court concluded that the residency restrictions of Jessica's Law *are* punitive, that the initiative measure made these restrictions an integral part of every registration order, including defendant's, and that the lack of jury findings to support the instant order thus violated *Apprendi*.

On review, the People urge at the outset that even if the residency restrictions of Jessica's Law are punitive, they do not invalidate defendant's registration order because they *simply do not apply* to this order. The People posit that as a matter of statutory intent, section 3003.5(b)'s residency restrictions apply only to parolees while they are on parole, and have no effect on a nonparolee misdemeanant such as defendant.

We need not, and do not, decide this threshold issue of statutory construction in order to resolve the narrow *Apprendi* issue before us. Even if we assume, as defendant insists, that section 3003.5(b) does apply to him, we are

3

persuaded, for three separate and independently dispositive reasons, that *Apprendi* does not invalidate his registration order.

First, as the People also argue, the effect of *Apprendi* on the residency restrictions of Jessica's Law is obviated by a post-*Apprendi* decision, *Oregon v. Ice* (2009) 555 U.S. 160 (*Ice*). In *Ice*, the high court concluded that the Sixth Amendment's protections must be viewed in light of the jury trial right as it existed at the time the Constitution was adopted, and cannot intrude unduly on the sovereign states' historical dominion over the subsequent development of their penal systems. Hence, the *Ice* court determined, *Apprendi* has no application to sentencing decisions in which juries played no factfinding role at common law. Sentencing choices such as sex offender residency restrictions are devices, developed by the sovereign states in more modern times, that were not historically entrusted to juries. A requirement that juries must always authorize them would often interfere with their intended and effective implementation. Thus, we need not inquire further into whether they are or are not punitive in order to conclude they are not limited by *Apprendi*.

Second, we disagree in any event that the residency restrictions constitute a penalty for purposes of *Apprendi*. Under tests traditionally employed to determine what constitutes punishment for constitutional purposes, the residency restrictions, like sex offender registration itself, cannot facially be considered anything other than a legitimate, nonpunitive regulatory device. Their manifest intent is not to exact retribution, or to deter by threat of sanction, but to promote public safety by physically insulating vulnerable children from potentially recidivist registered sex offenders who might prey upon them. The restrictions may impose significant life

4

difficulties in particular situations or communities,[2] but they do not so resemble historical forms of punishment, and are not, on their face, so onerous, disabling, irrational, or overbroad as to require a conclusion that their punitive effect overrides their regulatory purpose.

Third, even if the residency restrictions of Jessica's Law did require jury findings under *Apprendi*, this would not mean a registration order unsupported by such findings must be struck. No reason appears why the nonpunitive registration order itself should not survive in such a case, even if the attendant residency restrictions were unenforceable.

For these multiple reasons, we conclude the Court of Appeal erred in holding, under *Apprendi*, that defendant's sex offender registration order is invalid. Accordingly, we will reverse the Court of Appeal's judgment insofar as it struck the order from defendant's conviction.

## FACTS AND PROCEDURAL BACKGROUND

In October 2005, the Orange County District Attorney charged defendant by information with one count of committing a lewd act upon a child under the age of 14. (§ 288, subd. (a).)

The case was tried in 2007. Lori C., the minor victim, testified that one day in June 2003, while she was staying at her grandmother's apartment in Anaheim, she met defendant Steve Mosley, who was 18 years old at the time. She told defendant she was 12 years old. That evening Lori went to the apartment complex laundry room. Defendant walked up behind her, and when she turned around, he kissed her on the mouth.

---

[2] See, for example, *In re Taylor* (Mar. 2, 2015, S206143) __ Cal.4th ___ (S206143) (*Taylor*), a companion case we also file today. We discuss *Taylor* at greater length later in this opinion. (Fn. 15, *post*.)

5

Approximately three days later, Lori was in the apartment complex carport. Defendant approached her and kissed her on the neck, telling her to relax and not say anything. Lori tried to move away, but defendant held her wrists and pinned her to the wall with the weight of his body so she could not move. Defendant tried to stick his tongue into her mouth. He then put his hand up her shirt and down her pants, grabbing her breasts and buttocks and rubbing her between her legs. Pulling down his own shorts and pulling Lori's skirt to one side, defendant put his penis in Lori's vagina "for about two minutes."

Lori's older brother, who was approximately 14 years old at the time of the incident, saw defendant standing in front of Lori with his shorts pulled down around his knees and the bottom of the shorts touching the ground. Lori's younger brother, who was approximately 11 years old at the time of the incident, also saw defendant with his shorts pulled down to his knees and his arms around Lori, who was pinned up against a wall. Her younger brother could see defendant's naked buttocks, and heard his sister say "no" to defendant at least three times. He went and told his grandmother, who came outside and saw Lori struggling with defendant. She called out Lori's name and yelled to defendant, "What are you doing? She's only twelve." Defendant turned around, saw the grandmother, and fled by jumping over a wall.

Scared, confused, and embarrassed, Lori did not tell anyone else about the assault until several months later when she confided in her father and he reported the incident to the police. An Orange County Sheriff's Department investigator interviewed Lori in August 2003 and again in September 2005. During the interviews, Lori related substantially the same account of events to which she would later testify at trial. The Orange County Sheriff's Department did not request a sexual assault examination due to the passage of time, but Lori's parents

6

took her for a medical examination to determine if she had contracted any sexually transmitted diseases as a result of the assault.

The jury acquitted defendant of the charge of committing a lewd act on a child under 14, but convicted him of the lesser included offense of simple assault, a misdemeanor. (§ 240.) Defendant was sentenced to six months in the county jail with 180 days credit for time served.

Although the jury found defendant not guilty of the charged sexual offense and guilty only of assault, the trial court exercised its discretion to order defendant to register as a sex offender pursuant to former section 290, subdivision (a)(2)(E).[3] The court noted, "We simply don't know what the jury—why the jury acquitted the defendant. It's certainly not obvious that they disbelieved the witnesses." As required, the court stated on the record the reasons for its findings and the reasons it was requiring registration. (§ 290.006.) It found the evidence established beyond a reasonable doubt that "the assault in this case was committed as a result of sexual compulsion or for purposes of sexual gratification."[4] It took note of

---

[3]     At the time of trial, the discretionary registration provision was contained in former section 290, subdivision (a)(2)(E). The provision was thereafter moved to section 290.006, and former section 290 was rewritten to delete subdivision (a)(2)(E), effective October 13, 2007. (Stats. 2007, ch. 579, §§ 8 and 14.) For sake of clarity, we shall refer to the section containing the discretionary registration provision invoked by the trial court below as section 290.006.

Section 290.006 provides: "Any person ordered by any court to register pursuant to the Act for any offense not included specifically in subdivision (c) of Section 290, shall so register, if the court finds at the time of conviction or sentencing that the person committed the offense as a result of sexual compulsion or for purposes of sexual gratification. The court shall state on the record the reasons for its findings and the reasons for requiring registration."

[4]     The court indicated it was making this finding beyond a reasonable doubt although fully aware that, under the discretionary registration statute, the required finding need only be found true by a preponderance of the evidence. (§ 290.006.)

7

Lori's "truthful and sincere" testimony that defendant "grabbed her, kissed her, fondled her breasts, buttocks and the area between her legs, dropped his pants and inserted his penis into her vagina." It noted Lori's grandmother testified she saw Lori struggling with defendant, and her brothers each testified they saw Lori with her back to the wall and defendant leaning against her with his pants down around his ankles. The court found defendant was "even more likely" driven by sexual compulsion because he assaulted Lori in an open carport, and the assault was "not an isolated incident" because he had approached and kissed her once before. In addition, the court found registration was appropriate because defendant was physically dangerous to the public, at serious risk to reoffend, and not under treatment for his sexual compulsion. The registration order was stayed pending appeal.

On appeal, defendant conceded the validity of his misdemeanor assault conviction but challenged the registration order as factually unwarranted, and thus an abuse of the trial court's discretion. For the first time in his reply brief, defendant raised the additional claim that the order was invalid under *Apprendi* because it included the residency restrictions set forth in Jessica's Law.[5] Defendant argued that, by barring him as a registered sex offender from residing within 2,000 feet of schools or parks where children gather (§ 3003.5(b)), the restrictions increased the penalty for his assault conviction beyond the statutory maximum. Accordingly, he urged, because the trial court, and not the jury, had

---

[5] We note that the residency restrictions set forth in Jessica's Law took effect on November 8, 2006, the day after the November 7, 2006, General Election. (See Cal. Const., art. II, § 10, subd. (a).) They were thus in effect on March 16, 2007, when the trial court imposed the registration requirement on defendant in this case.

found the facts required to support the discretionary registration order, the order violated his *Apprendi* jury trial guarantee and must be stricken.

In its first opinion (*Mosley I*), the Court of Appeal rejected defendant's abuse of discretion claim, but agreed with his *Apprendi* argument. The appellate court reasoned that defendant, who was subject to the registration requirement, was also subject to the residency restrictions under section 3003.5(b)'s plain and express terms. Thus, the court ruled, *Apprendi* required the facts necessary to support the order to be found by a jury beyond a reasonable doubt, because the residency restrictions, analyzed under the multi-factor "intent/effects" test set forth in *Kennedy v. Mendoza-Martinez* (1963) 372 U.S. 144 (*Mendoza-Martinez*), "[have] an overwhelming punitive effect" and served to increase the punishment for defendant's assault conviction beyond the statutory maximum.

We granted review in *Mosley I*, ordered briefing deferred, and held the matter for the then-pending decision in *In re E.J.* (2010) 47 Cal.4th 1258 (*E.J.*). In *E.J.*, we subsequently rejected an ex post facto challenge to the residency restrictions, as applied to four registered sex offenders who committed crimes prior to Jessica's Law, but who were released on parole for those crimes after the initiative measure became effective. We held that including the residency restrictions as mandatory parole conditions did not violate the ex post facto clauses by imposing punishment for the earlier crimes beyond that applicable when they were committed. We explained that the residency restrictions applied "to events occurring after" the statute's effective date — the release of the petitioners on parole, and their subsequent residency in noncompliant housing, and thus did not constitute punishment for the original offenses. (*Id.* at p. 1280.)

After our decision in *E.J.* became final we retransferred the cause in *Mosley I* to the Court of Appeal for reconsideration in light of our holding in *E.J.* In a second published opinion, the Court of Appeal again concluded defendant

9

was subject to the residency restrictions by virtue of the registration order, and that although sex offender registration itself may be regulatory, the restrictions, under application of the *Mendoza-Martinez* test, have an "overwhelming punitive effect." Accordingly, the Court of Appeal again struck the trial court's registration order, affirming the judgment of conviction as so modified.

We granted the People's petition for review.[6]

## DISCUSSION

As noted, in *Apprendi*, the high court established that a criminal defendant generally has the Sixth Amendment right to a jury determination, beyond reasonable doubt, of "any fact that increases the penalty for a crime beyond the prescribed statutory maximum." (*Apprendi*, *supra*, 530 U.S. at p. 490.) Defendant claims that his registration order is invalid because it increased the maximum penalty, or punishment, for his simple assault conviction and was imposed solely on the basis of findings made by a judge, not a jury.

Defendant concedes that sex offender registration itself does not constitute a penalty, or punishment, for purposes of constitutional analysis. (See, e.g., *Smith v. Doe* (2003) 538 U.S. 84, 93, 105-106 [sex offender registration statutes serve the legitimate nonpunitive governmental objective of protecting the public from sex offenders]; *People v. Picklesimer* (2010) 48 Cal.4th 330, 343-344 (*Picklesimer*) [because sex offender registration is not punishment, *Apprendi* does not require jury findings to support registration order]; *People v. Presley* (2007) 156 Cal.App.4th 1027, 1033-1035 [same].) But he urges, and the Court of Appeal

---

**6** Amici curiae briefs have been filed in support of defendant by the California Public Defenders Association, the California Attorneys for Criminal Justice, and the California Coalition on Sexual Offending/Association for the Treatment of Sexual Abusers (joint brief).

10

agreed, that the *residency restrictions* established by Jessica's Law *are* punitive, and that jury findings were thus required to support the registration order to which the restrictions attached.

The People oppose this conclusion on multiple grounds. They first urge that defendant's *Apprendi* argument fails at the threshold, because, contrary to his insistence, his registration order *does not include* any obligation to comply with the residency restrictions of Jessica's Law. The People posit that the residency restrictions of section 3003.5(b) apply only to paroled sex offender registrants while they are on parole, and have no effect on nonparolee registrants such as defendant.

However, we need not, and do not, decide this threshold statutory construction issue in advance of any concrete evidence of prosecutors' intent to press charges against nonparolee sex offender registrants for noncompliance with the residency restrictions.[7] Even if we assume the restrictions do impose

---

[7]     We took a similar restrained approach in *E.J.*, wherein we rejected two facial constitutional challenges to section 3003.5(b) as a parole condition. We explained, "[t]he further question of whether section 3003.5(b) also created a separate new misdemeanor offense applicable to all sex offenders subject to the registration requirement of section 290, irrespective of their parole status, is not before us, as there is no allegation or evidence that these petitioners, or any other registered sex offenders, whether on parole or otherwise, have ever been separately charged with such an offense under the new provision." (*E.J.*, *supra*, 47 Cal.4th at p. 1271, fn. 5.)

Citing canons of judicial economy and restraint, the concurring and dissenting opinion criticizes us at length for extending *E.J.*'s approach to the instant case. Here, the concurring and dissenting opinion reasons, if a court can find at the outset that section 3003.5(b) does *not* apply to nonparolee sex offender registrants, his *Apprendi* claim can be rejected, and the case can be decided, without the need to examine any constitutional questions. But the concurring and dissenting opinion then argues that the statute *does* apply to all registered sex offenders, both parolee and nonparolee. This makes it necessary for the

*(footnote continued on next page)*

11

criminally enforceable obligations on nonparolee registrants such as defendant, we are persuaded, for three independently dispositive reasons, that *Apprendi* does not invalidate the registration order here at issue. We explain our conclusions in detail.

### A. *Apprendi* and *Oregon v. Ice*.

In *Apprendi*, the defendant pleaded guilty to two counts of unlawful weapons possession and one count of unlawful possession of a bomb. A separate New Jersey hate crime statute provided for an " 'extended term' of imprisonment if the trial judge [found], by a preponderance of the evidence, that '[t]he defendant in committing the crime acted with a purpose to intimidate an individual or group of individuals because of race, color, gender, handicap, religion, sexual orientation or ethnicity.' " (*Apprendi*, *supra*, 530 U.S. at pp. 468-469.) None of the charged counts referred to the hate crime statute, and none alleged that Apprendi had acted with a racially biased purpose. At sentencing, the trial court found, by a preponderance of the evidence, that Apprendi's crime under one count to which he had pled guilty was motivated by racial bias within the meaning of the hate crime

---

*(footnote continued from previous page)*

concurring and dissenting opinion to proceed to the constitutional issues in any event. Respectfully, we fail to see how judicial economy and restraint are thereby served. Under the particular circumstances, where no issue of a possible violation of section 3003.5(b) by defendant or anyone else is presented, we remain persuaded, as the concurring and dissenting opinion suggests, that the statutory question is not ripe for decision. Concluding, as we do, that *Apprendi* is *inapplicable* to the residency restrictions of Jessica's Law *even if* they extend to nonparolee sex offender registrants, we believe true adherence to judicial restraint and economy counsels against an unnecessary detour into an analysis of the statutory meaning.

statute, which court-made finding resulted in an increased term of imprisonment for that count. (*Id*. at pp. 470-471.)

The high court in *Apprendi* observed that the Sixth Amendment right to trial by jury, and the Fourteenth Amendment right to due process of law in criminal matters, "constitutional protections of surpassing importance" (*Apprendi*, *supra*, 530 U.S. at p. 476), together "indisputably entitle a criminal defendant to 'a jury determination that [he or she] is guilty of every element of the crime with which he [or she] is charged, beyond a reasonable doubt.' " (*Id*. at p. 477.) The court further found that the Sixth Amendment jury trial right applied equally to any enhancements to the crime used to impose additional punishment. (*Id*. at p. 476.) The court summarized its holding as follows: "Other than the fact of a prior conviction, any fact that increases the penalty for a crime beyond the prescribed statutory maximum must be submitted to a jury, and proved beyond a reasonable doubt." (*Id*. at p. 490.)

In decisions that followed in the wake of *Apprendi*, the high court expounded on what it meant by the phrase "any fact that increases the penalty for a crime *beyond the prescribed statutory maximum*." (*Apprendi*, *supra*, 530 U.S. at p. 490, italics added.) In *Ring v. Arizona* (2002) 536 U.S. 584 (*Ring*), the court held that allowing the sentencing judge, rather than the jury, to find aggravating circumstances necessary to impose the death penalty violates a capital defendant's Sixth Amendment jury trial right under *Apprendi*. (*Ring*, at pp. 602, 609.) In *Blakely v. Washington* (2004) 542 U.S. 296 (*Blakely*), the court held that "the 'statutory maximum' for *Apprendi* purposes is the maximum sentence a judge may impose *solely on the basis of the facts reflected in the jury verdict or admitted by the defendant*." (*Id*. at p. 303.) In *United States v. Booker* (2005) 543 U.S. 220 (*Booker*), the court held that the federal sentencing guidelines violated the Sixth Amendment right to a jury trial by allowing the court to impose sentence

13

enhancements based on its own fact finding, and severed the guideline provisions that made them mandatory. (*Id*. at pp. 226-227.) The court in *Booker* explained that one principle it sought to vindicate in *Apprendi* was the avoidance of " 'arbitrary punishments upon arbitrary convictions' without the benefit of a jury." (*Id*. at pp. 238-239.) And in *Cunningham v. California* (2007) 549 U.S. 270 (*Cunningham*), the court held that California's then operative determinate sentencing law violated a criminal defendant's right to trial by jury by "allow[ing] a judge to impose a sentence above the statutory maximum based on a fact, other than a prior conviction, not found by a jury or admitted by the defendant." (*Id.* at p. 275.)

Although the high court has not specifically defined the word "penalty" as used in *Apprendi* ("any fact that increases the *penalty* for a crime beyond the prescribed statutory maximum" (*Apprendi*, *supra*, 530 U.S. at p. 490, italics added)), *Apprendi* itself involved a court-made factual finding that directly increased the length of the prison sentence for the crime to which the defendant had pled guilty. Likewise, longer prison terms for the crimes of which the defendants had been convicted, based on facts found by the sentencing court, and not a jury, were also at the heart of the high court's post-*Apprendi* decisions in *Blakely, supra,* 542 U.S. at page 303; *Booker, supra,* 543 U.S. at pages 226-227; and *Cunningham, supra,* 549 U.S. at page 275. In *Ring, supra,* 536 U.S. at pages 602, 609, the ultimate penalty of death, as opposed to a term of life without parole for capital murder, was implicated in similar fashion.

The high court's decision in *Ice, supra*, 555 U.S. 160, refined and circumscribed the scope of the rule of *Apprendi* and its progeny in significant ways. *Ice* was decided nearly two years before the Court of Appeal filed its decision in this matter. Although neither the parties' briefs in the Court of Appeal,

14

nor that court's decision, mentions or discusses *Ice*, we are duty bound to consider its application to the *Apprendi* claim here before us.

In *Ice*, the defendant claimed the facts underlying a decision to impose consecutive sentences must be made by a jury within the meaning of *Apprendi*'s Sixth Amendment jury trial guarantee. Rejecting the claim, the high court distinguished sentencing for multiple offenses from the imposition of increased punishment for a particular crime, which was at the heart of the holdings in *Apprendi* and its progeny. (*Ice*, *supra*, 555 U.S. at pp. 167-168.)

The court in *Ice* first observed that "[o]ur application of *Apprendi*'s rule must honor the 'long-standing common-law practice' in which the rule is rooted. [Citation.] The rule's animating principle is the preservation of the jury's historic role as a bulwark between the State and the accused at the trial for an alleged offense." . . . *Apprendi*, 530 U.S., at 477." (*Ice*, *supra*, 555 U.S., at pp. 167-168 The court then explained that "the Sixth Amendment does not countenance legislative encroachment on the jury's traditional domain" (*Ice*, at p. 168, citing *Apprendi*, *supra*, 530 U.S. at p. 497); that the appropriate consideration in *Apprendi* was therefore "whether the finding of a particular fact was understood as within 'the domain of the jury . . . by those who framed the Bill of Rights' (*Harris v. United States* (2002) 536 U.S. 545, 557)" (*Ice*, at p. 168); and that "[i]n undertaking this inquiry, we remain cognizant that administration of a discrete criminal justice system is among the basic sovereign prerogatives States retain. (*Patterson v. New York* (1977) 432 U.S. 197, 201.)" (*Ice,* at p. 168.)

The high court further explained, "These twin considerations — historical practice and respect for state sovereignty — counsel against extending *Apprendi*'s rule to the imposition of [consecutive] sentences" because "[t]he decision to impose sentences consecutively is not within the jury function that 'extends down centuries into the common law.' *Apprendi,* 530 U.S. at p. 477." (*Ice, supra*, 555

15

U.S. at p. 168.)  The court observed that, historically, "the jury played no role in the decision to impose sentences consecutively or concurrently.  Rather, the choice rested exclusively with the judge."  (*Ibid.*)  "In light of this history," the court declared, "legislative reforms regarding the imposition of multiple sentences do not implicate the core concerns that prompted our decision in *Apprendi.*  There is no encroachment here by the judge upon facts historically found by the jury, nor any threat to the jury's domain as a bulwark at trial between the State and the accused."  (*Id.* at p. 169.)

The court distinguished its decision in *Cunningham, supra,* 549 U.S. 270, explaining why that decision "[did] not control" on the facts before it.  (*Ice, supra,* 555 U.S. at p. 170.)  "[W]e held in *Cunningham* that the facts permitting imposition of an elevated 'upper term' sentence for a particular crime fell within the jury's province.  [Citation.]  The assignment of such a finding to the sentencing judge implicates *Apprendi*'s core concern: a legislative attempt to 'remove from the [province of the] jury' the determination of facts that warrant punishment for a specific statutory offense.  *Apprendi,* 530 U.S., at p. 490 (internal quotation marks omitted).  We had no occasion to consider the appropriate inquiry when no erosion of the jury's traditional role was at stake.  *Cunningham* thus does not impede our conclusion that, as *Apprendi*'s core concern is inapplicable to the issue at hand, so too is the Sixth Amendment's restriction on judge-found facts."  (*Ice, supra,* 555 U.S. at p. 170.)

The court in *Ice* reasoned further, "States' interest in the development of their penal systems, and their historic dominion in this area, also counsel against the extension of *Apprendi* that [the defendant] requests.  Beyond question, the authority of States over the administration of their criminal justice systems lies at the core of their sovereign status. [Citation.]  We have long recognized the role of the States as laboratories for devising solutions to difficult legal problems.

16

[Citation.] This Court should not diminish that role absent impelling reason to do so." (*Ice, supra,* 555 U.S. at pp. 170-171.)

Finally, the high court in *Ice* cautioned, ". . . States currently permit judges to make a variety of sentencing determinations other than the length of incarceration. Trial judges often find facts about the nature of the offense or the character of the defendant in determining, for example, the length of supervised release following service of a prison sentence; required attendance at drug rehabilitation programs or terms of community service; and the imposition of statutorily prescribed fines and orders of restitution. [Citation.] Intruding *Apprendi*'s rule into these decisions on sentencing choices or accoutrements surely would cut the rule loose from its moorings." (*Ice, supra,* 555 U.S. at pp. 171-172.)

As pointed out (and criticized) by the dissent in *Ice*, the focus of the majority's rationale was *not* on whether the trial court's finding of facts necessary to support the imposition of consecutive sentences increased the overall punishment for the defendant's crimes "beyond the prescribed statutory maximum" (*Apprendi*, *supra*, 530 U.S. at p. 490). (*Ice, supra,* 555 U.S. at p. 173 (dis. opn. of Scalia, J.).) Nor, it may be observed, did the majority in *Ice* seek to apply the multi-factor intent/effects test for "punishment" fashioned earlier in *Mendoza-Martinez, supra,* 372 U.S. 144, or otherwise attempt to determine if imposition of consecutive sentences "increases the penalty for a crime beyond the prescribed statutory maximum." (*Apprendi, supra,* 530 U.S. at p. 490.) Instead, the majority in *Ice* relied on historical practice evidencing the absence of any traditional role played by jury at common law in the determination whether to impose consecutive sentences, as well as principles of state sovereignty over the States' administration of their criminal justice systems, to conclude *Apprendi*'s Sixth Amendment jury trial guarantee is not implicated in a decision to impose consecutive sentences.

17

This narrowed scope and proper focus of *Apprendi*'s rule was again highlighted in *Southern Union Co. v. U. S.* (2012) ___ U.S. ___ [132 S.Ct. 2344] (*Southern Union*). In that case, the high court held that "the rule of *Apprendi* applies to the imposition of criminal fines." (*Id.* at p.___ [132 S.Ct. at p. 2357].) The court based its holding on "ample historical evidence showing that juries routinely found facts that set the maximum amounts of fines." (*Id*. at p. ___ [132 S.Ct. at p. 2356].) The court explained that "the salient question here is what role the jury played in prosecutions for offenses that did peg the amount of a fine to the determination of specified facts — often, *the value of damaged or stolen property*. [Citation.] Our review of state and federal decisions discloses that the predominant practice was for such facts to be alleged in the indictment and proved to the jury. [Citations.]" (*Id.* at pp.___-___ [132 S.Ct. at pp. 2353-2354], italics added.) The court concluded that criminal fines, like imprisonment or a death sentence, constituted a form of punishment at common law, in which the jury traditionally determined the underlying factual basis. (*Id.* at pp. ___-___ [132 S.Ct at pp. 2350-2351].) The court in *Southern Union* reiterated that " 'the scope of the constitutional jury right must be informed by the historical role of the jury at common law.' " (*Id.*, at p. ___ [132 S.Ct. at p. 2353], quoting *Ice, supra*, 555 U.S. at p. 170; see also *Blakely, supra,* 542 U.S. at pp. 301-302; *Apprendi, supra,* 530 U.S. at pp. 477-484.)

The rationale and holding of *Ice* compel the conclusion that defendant's discretionary registration order, based on factual findings made by the court pursuant to statute (§ 290.006), as well as any further consequence that, as a registered sex offender, he must now comply with section 3003.5(b)'s statutory residency restrictions, do not implicate *Apprendi*'s Sixth Amendment jury trial right. *Apprendi* is inapplicable because sex offender registration and residency

18

requirements are not sentencing matters in which, historically, the jury has played any traditional role at common law.

Instead, both residency restrictions and underlying sex offender registration requirements are modern regulatory sentencing imperatives unknown at common law. They are akin to "a variety of sentencing determinations other than the length of incarceration," of relatively recent vintage, in which "trial judges often find facts about the nature of the offense or the character of the defendant" — such as "the length of supervised release following service of a prison sentence; [and] required attendance at drug rehabilitation programs or terms of community service." (*Ice*, *supra*, 555 U.S. at p. 171) They are additional examples of "sentencing choices or accoutrements" (*id*., at p. 172) in which juries have played no historical role, and which do not implicate the Sixth Amendment jury trial guarantee within the meaning of *Apprendi*.[8]

The fact that any obligation to comply with the residency restrictions follows from the sex offender's status as a section 290 registrant and the statutory imperative of section 3003.5(b), rather than from court-made factual findings specifically addressed to those restrictions, does not change the analysis or result. The holding in *Ice* was not predicated on a determination of the historical role traditionally played by *the judge* at common law. Nor was it otherwise limited to

---

[8]  In *Southern Union*, the court later circumscribed *Ice*'s reference to "statutorily prescribed fines" (*Ice*, *supra*, 555 U.S. at p. 171) as an example of sentencing determinations in which juries played no traditional role. (*Southern Union*, *supra*, ___ U.S. at p. ___, fn. 5 [132 S.Ct. at p. 2352, fn. 5.]) The *Southern Union* court explained that, contrary to *Ice*'s suggestion, juries did have historical involvement in finding the facts underlying the permissible amounts of criminal fines. But the court expressed no criticism or limitation with respect to the other examples cited in the *Ice* text quoted above.

sentencing choices already specifically entrusted to *judges rather than juries* at the time the Bill of Rights was drafted and adopted. Instead, it rested solely on *the absence of any "historical role" traditionally played by the jury "at common law"* respecting the imposition of consecutive sentences. (*Ice, supra,* 555 U.S. at p. 170, italics added.) Here, as in *Ice*, there is no *jury* tradition connected to the sentencing decision at issue.[9]

Our conclusion is buttressed by the other of the "twin considerations" emphasized in *Ice* — "respect for state sovereignty" (*Ice*, *supra*, 555 U.S. at p. 168). Residency restrictions like those set forth in Jessica's Law are exercises of the states' authority "over the administration of their criminal justice systems which lies at the core of their sovereign status." (*Id.* at p. 171.) Measures of this kind involve the states' predominant responsibility to " 'prevent[ ] and deal[ ] with

---

[9] The concurring and dissenting opinion virtually reads the "historic jury role" analysis out of *Ice*. Citing selected language from *Ice* and *Southern Union*, the concurring and dissenting opinion suggests these decisions, taken together, leave *Apprendi* rigidly applicable to each and every factual determination, of whatever kind or nature, that is necessary to impose a particular kind or degree of "punishment" for any discrete crime except the pettiest — even if common law juries were never involved with the sentencing determination at issue. But the high court's approach in *Southern Union* belies such a conclusion. There, the majority did not simply hold that because a significant criminal fine is "punishment" for a discrete crime, a jury must find any facts necessary to impose it. Instead, as we have indicated, the majority stressed that, in any event, the court of appeals had acted "correct[ly]" by examining the jury's traditional role with respect to monetary fines *in particular*, because the constitutional right to a jury " 'must be informed' " by common law tradition. (*Southern Union*, *supra*, ___ U.S. at p. ___ [132 S.Ct. at p. 2353], quoting *Ice*, *supra*, 555 U.S. at p. 170.) The majority then engaged in its own careful historical examination to assure itself that juries had indeed commonly found the facts necessary to determine the permissible amounts of criminal fines. (*Southern Union*, *supra*, at pp. ___-___ [132 S.Ct. at pp. 2353-2356].) Here, by contrast, it is manifest that juries had no traditional role in the imposition of modern sentencing options, such as sex offender residency restrictions, that were unknown at common law.

20

crime' " and their role as "laboratories for devising solutions to difficult legal problems." (*Ibid.*) They are relatively modern attempts to address, by means short of secure confinement, the persistent problem of recidivism among sex offenders, particularly as it endangers the most vulnerable potential victims.[10] As *Ice* suggested, such efforts should not be hampered by extension of the jury-trial right beyond its core "absent impelling reason to do so." (*Ibid.*)

A requirement that a jury make all findings necessary to allow a judge to impose a sex offender registration requirement, with any attendant residency restrictions, would interfere with these efforts by creating practical difficulties similar to those cited in *Ice* itself. Under California's scheme for discretionary imposition of sex offender registration, the necessary predicate findings — in particular, the defendant's likelihood of reoffense — are not of a kind typically determined by a jury when considering the basic elements of a discrete criminal charge. The facts bearing on such a predictive assessment "could substantially prejudice the defense at the guilt phase of a trial. As a result, bifurcated . . . trials might often prove necessary." (*Ice*, *supra*, 555 U.S. at p. 172.) As in *Ice*, "[w]e will not so burden [our] trial courts absent any genuine affront to *Apprendi*'s instruction." (*Ibid.*)[11]

---

[10] Proposition 83 explicitly stated that it was aimed at confronting the "very high recidivism rates" among sex offenders, and their special danger to children. Relying on a report by the United States Department of Justice, the initiative declared that, of all violent felons, "sex offenders are the least likely to be cured and the most likely to reoffend, and they prey on the most innocent members of our society. More than two-thirds of the victims of rape and sexual assault are under the age of 18." (Ballot Pamp., *supra*, text of Prop. 83, § 2, subd. (b), at p. 127.)

[11] The concurring and dissenting opinion does not address this aspect of *Ice*'s analysis.

The Court of Appeal did not consider the impact of the holding in *Ice, supra,* 555 U.S. 160, on defendant's *Apprendi* claim. We have done so. Because there is no common law jury trial tradition related to sex offender registration and residency requirements, and because imposition of such a procedure now would interfere unduly with California's exercise of its sovereign right, and its predominant responsibility, to seek to prevent sex offenses against children, we conclude that the rationale of *Ice* applies here. On this basis alone, defendant's *Apprendi* claim must be rejected.

## B. Residency restrictions as "penalty for a crime."

In any event, even if applicable to defendant, the residency restrictions of Jessica's Law are not, on their face, an added "penalty" for his conviction to which *Apprendi* applies. Like sex offender registration requirements, the restrictions are not intended as punishment or retribution for the offense or offenses that led to their imposition. Rather, their purpose is to serve a legitimate regulatory goal — reducing the opportunity for persons convicted of sexually related crimes, who are at large in the community but still deemed dangerous, to reoffend in the future. The restrictions may lead to significant disabilities in individual cases, but in the abstract, they do not so resemble traditional forms of punishment, and are not so clearly punitive in effect, as to override their regulatory aim. For this separate reason, *Apprendi* does not require that they be justified at the outset by jury findings.

Recently rejecting an argument that *Apprendi* is violated when statutory sex offender *registration* is imposed solely on the basis of judge-made findings, we observed, "[a]s we have explained, 'sex offender registration is not considered a form of punishment under the state or federal Constitutions [citations] . . . .' (*Hofsheier*, *supra*, 37 Cal.4th at p. 1197; see also *Smith v. Doe*[, *supra*,] 538 U.S. 84, 105-106 [sex offender registration is not punishment for purposes of the ex

22

post facto clause].) Accordingly, *Apprendi*'s requirement that '[o]ther than the fact of a prior conviction, any fact that increases the penalty for a crime beyond the prescribed statutory maximum must be submitted to a jury, and proved beyond a reasonable doubt' (*Apprendi*, at p. 490) has no application here. [Citations.]" (*Picklesimer*, *supra*, 48 Cal.4th at pp.343-344.)

This analysis — and in particular, the citation to *Smith v. Doe* — signaled that, when addressing *Apprendi* challenges to restrictions on convicted sex offenders, we are guided by the factors *Smith v. Doe* identified as relevant to determining whether attempts to control dangerous sex criminals constitute punishment. We adopt that procedure here.

In doing so, we begin with the settled principle that in the interest of protecting public safety, "an imposition of restrictive measures on sex offenders adjudged to be dangerous is 'a legitimate nonpunitive governmental objective and has been historically so regarded.' [Citation.]" (*Smith v. Doe*, *supra*, 538 U.S. 84, 93.) At the outset, therefore, the inquiry is whether the state legislative authority, in adopting a law allowing a court to impose such restrictions, intended them as punishment, or instead meant to adopt a nonpunitive regulatory scheme. (*Id.*, at p. 92.)

Of course, "[i]f the intention . . . was to impose punishment, that ends the inquiry. If, however, the intention was to enact a regulatory scheme that is civil and nonpunitive, we must further examine whether the . . . scheme is ' "so punitive either in purpose or effect as to negate [the State's] intention" to deem it "civil." ' [Citation.] Because we 'ordinarily defer to the legislature's stated intent' [citation], ' "only the clearest proof" will suffice to override legislative intent and transform what has been denominated a civil remedy into a criminal penalty,' [citations]." (*Smith v. Doe*, *supra*, 538 U.S. 84, 92.)

23

"In analyzing the effects of the [legislative] [a]ct, we refer to the seven factors noted in . . . *Mendoza-Martinez*, [*supra*,] 372 U.S. 144, 168-169, as a useful framework.  The factors most relevant to our analysis are whether, in its necessary operation, the regulatory scheme: has been regarded in our history and traditions as a punishment; imposes an affirmative disability or restraint; promotes the traditional aims of punishment; has a rational connection to a nonpunitive purpose; or is excessive with respect to this purpose."  (*Smith v. Doe*, *supra*, 538 U.S. 84, 97.)  We analyze these factors "in relation to the statute on its face." (*Mendoza-Martinez*, *supra*, 372 U.S. at p. 169.)**12**

Because of the structure and scope of Proposition 83, the measure did not specifically state why the voters adopted the residency restrictions in particular. The initiative included wide-ranging provisions, some clearly punitive, to combat the problem of sex offender recidivism.  Besides establishing the residency restrictions now set forth in section 3003.5(b), Proposition 83 broadened the definition of certain sex offenses.  As to some such crimes, it prohibited probation, mandated longer prison terms, eliminated early release credits, and extended the period of parole.  It imposed compulsory lifetime GPS monitoring on persons required to register as sex offenders because of felonies for which they were imprisoned.  And it expanded the reach of the laws governing the civil commitment of sexually violent predators. (See Ballot Pamp., *supra*, analysis of Prop. 83 by Legis. Analyst, at pp. 43-44.)

---

**12**    Because we here address a narrow claim that the residency restrictions are *facially* and *inherently* punitive for purposes of *Apprendi*, we are thus unpersuaded by the concurring and dissenting opinion's references to secondary sources suggesting that the restrictions have had adverse practical effects among registered sex offenders throughout the state.  (But see fn. 15, *post*.)

24

The findings set forth in Proposition 83 suggest that, overall, the electorate had a mix of punitive, deterrent, and protective motives. The measure they adopted was officially titled The Sexual Predator Punishment *and Control* Act: Jessica's Law. (Ballot Pamp., *supra*, text of Prop. 83, § 1, at p. 127, italics added.) It included statements that California "places a high priority on maintaining public safety through . . . laws that *deter* and punish criminal behavior." (*Id.*, § 2, subd. (a), italics added.) It declared that "Californians have a right to know about the presence of offenders in their communities, near their schools, and around their children" (*id.*, subd. (g), at p. 127), but "must also take additional steps to *monitor* sex offenders, to *protect the public* from them, and to provide adequate penalties for *and safeguards against* sex offenders, particularly those who prey on children" (*id.*, subd. (h), at p. 127 (italics added)). With the changes incorporated in Proposition 83, the measure averred, "Californians will be in a better position to keep themselves, their children, and their communities safe from the threat posed by sex offenders." (*Id.*, subd. (e), at p. 127.) Thus, Proposition 83 asserted, "It is the intent of the People in enacting this measure to help Californians better protect themselves, their children, and their communities; it is not the intent of the People to embarrass or harass persons convicted of sex offenses." (*Id.*, subd. (f) , at p. 127.)

The protective aims of the residency restrictions in particular come into clearer focus in the ballot arguments by supporters of Proposition 83. The argument in favor of the measure asserted that "Proposition 83 — Jessica's Law — will protect our children by keeping child molesters . . . away from schools and parks" and will "[c]reate predator free zones around schools and parks to prevent sex offenders from living near where our children learn and play." (Ballot Pamp., *supra*, argument in favor of Prop. 83, at p. 46, word capitalization and italics omitted.) According to the proponents, "Proposition 83 means dangerous child

molesters will be kept away from our children." (*Ibid.*, italics omitted.) In their rebuttal to the opponents' argument, supporters of Proposition 83 insisted that "Jessica's Law will stop dangerous sex offenders from living near schools and parks where they can stalk and prey on our children." (Ballot Pamp., rebuttal to argument against Prop. 83, at p. 47 (word capitalization omitted).)

These provisions strongly indicate that any restrictions imposed by the electorate on where registered sex offenders may live were not intended to add to the punishment for a criminal conviction. Rather, the clear aim was to promote public safety by ensuring that children could learn and play in zones where they would not encounter registered sex offenders who lived nearby.

Indeed, "where a legislative restriction 'is an incident of the State's power to protect the health and safety of its citizens,' it will be considered 'as evidencing an intent to exercise that regulatory power, and not a purpose to add to the punishment.' [Citation.]" (*Smith v. Doe*, *supra*, 538 U.S. at p. 93.) A contrary conclusion is not compelled insofar as the residency restrictions of Jessica's Law were placed in the Penal Code and made it "unlawful" to reside near a school or park. (*Id.*, at p. 94.)

Accordingly we, like the Court of Appeal, are persuaded that the electorate had a regulatory, nonpunitive purpose. We therefore consider whether the restrictions, if generally applicable to nonparolee registered sex offenders in California, nonetheless have such a necessary punitive effect as to override this nonpunitive intent, and thus to require jury findings before they can be imposed. We conclude they do not.

When addressing the issue of punitive effect, the Court of Appeal was strongly influenced by the degree of affirmative disability or restraint it perceived in the residency restrictions. The Court of Appeal stressed that the restrictions include no "grandfather provisions" or grace periods. Hence, the court observed, a

26

registered sex offender cannot stay in his or her own home if it lies within a prohibited area, and an offender must move from an already established residence if a school or park later opens nearby.**13**  In such a case, the court noted, the offender and his or her family must either relocate as a group or live apart. Moreover, the court pointed out, it may be difficult to find compliant housing "given the sweeping nature of the zone[s] of exclusion," and the restricted choice of residence may also affect the offender's employment, and his or her access to medical care, rehabilitation programs, and elder assistance.  Indeed, the court suggested, the constant threat of ouster, and of difficulty in relocating, " 'seems a significant deprivation of [registered sex offenders'] liberty and property interests. It sentences them to a life of transience, forcing them to become nomads.' " (Quoting *Mikaloff v. Walsh* (N.D. Ohio 2007) 2007 WL 2572268 at p. *10 (*Mikaloff*).)  Further, the court believed, these features of the residency restrictions render them "akin to banishment, a traditional form of punishment."

There is no doubt that the residency restrictions of Jessica's Law can produce significant difficulties and inconveniences in particular areas and individual cases.  (See fn. 15, *post*.)  But we are not persuaded that they so resemble traditional punishment, or are necessarily so harsh, as to compel a conclusion that their punitive effect overrides their regulatory intent.

Though potentially burdensome, the terms of the residency restrictions are limited.  "[They] impose[ ] no physical restraint, and so [do] not resemble the punishment of imprisonment, which is the paradigmatic affirmative disability or

---

**13**     Stretching its "parade of horribles" to the maximum, the Court of Appeals went so far as to observe that "[c]ommunity groups may set up private schools to force offenders to move away."  (Citing *Mann v. Georgia Dept. of Corrections* (Ga. 2007) 653 S.E.2d 740, 756.)

restraint. [Citation.]" (*Smith v. Doe*, *supra*, 538 U.S. at p. 100.) They infringe upon personal liberties far less than does the "post-incarceration confinement" of dangerously disordered sex offenders, which the high court has recognized as " 'a legitimate nonpunitive government objective.' " (*Id.*, at p. 93; see *Kansas v. Hendricks* (1997) 521 U.S. 346, 363; *Hubbart v. Superior Court* (1998) 19 Cal.4th 1138, 1173.) They do not regulate a registered sex offender's daily activities, and they seem, on their face, no harsher "than the sanction[ ] of occupational debarment, which [the high court has also] held to be nonpunitive. [Citations.]" (*Smith v. Doe*, at p. 100.)

Nor are the restrictions akin to banishment. One subject to them is not thereby excluded from the state or any part thereof. They do not dictate where he or she may travel, visit, shop, eat, work, or play. Even the law's domiciliary prohibitions are, by their terms, confined to specified geographic areas relevant to the regulatory purpose they serve. Hence, they do not, on their face, meet or approach the traditional definition of banishment — the entire dismissal, expulsion, or casting out from one's community, and into exile. (See, e.g., Black's Law Dict. (10th ed. 2014) p. 695, col. 1 ["Exile" is "[e]xpulsion from a country, esp. from the country of one's origin or longtime residense"]; banishment 1 Oxford English Dict. (2d ed. 1989) p. 929, col. 2 ["Banishment" is "[t]he action of authoritatively expelling [one] from the country; a state of exile; expatriation;" "[t]he action of peremptorily sending [one] away; a state of enforced absence; dismissal."].)[14]

---

[14] We are not persuaded toward a finding of punishment by the Court of Appeal's suggestion that the residency restrictions may infringe the *property* rights of registered sex offenders by denying them the residential use of noncompliant housing they already own or lease. Even statutes calling for the forfeiture of property may be deemed nonpunitive where adopted for a regulatory and remedial

*(footnote continued on next page)*

Further, the restrictions do not take on the character of punishment by comparison to forms of conditional, supervised postconviction release, such as probation and parole, which might be considered punitive. (See *Smith v. Doe*, *supra*, 538 U.S. at p. 101; cf., *People v. Nuckles* (2013) 56 Cal.4th 601, 609.) As applied to nonparolees such as defendant, the residency restrictions involve no oversight or supervision by penal authorities. Their violation cannot result in revocation of a conditional release; rather, the only arguable sanction is "a [criminal] proceeding separate from the individual's original offense." (*Smith v. Doe*, at p. 102.) The possibility of criminal prosecution for violation of the restrictions is simply calculated to give effect to a "valid regulatory" measure, and does not make them punitive. (*Ibid.*)

Similarly, there is little relevance to the fact that the restrictions, like criminal punishment, are aimed at deterring future crimes, and might have that effect. "Any number of governmental programs might deter crime without imposing punishment. 'To hold that the mere presence of a deterrent purpose renders such sanctions "criminal" . . . would severely undermine the Government's ability to engage in effective regulation.' [Citations.]" (*Smith v. Doe*, *supra*, 538 U.S. at p. 102.) Indeed, the primary deterrence of the residency restrictions is not a threat that wrongdoing will be met with sanctions — the premise of punishment. Rather, it is simply a way to reduce registered sex

_____

*(footnote continued from previous page)*

purpose. (See, e.g., *United States v. One Assortment of 89 Firearms* (1984) 465 U.S. 354 [after defendant was acquitted of dealing in firearms without a license, in rem action for forfeiture of the unlicensed firearms at issue, where action was authorized for regulatory purpose of limiting availability of such weapons to undesirable persons, was nonpunitive for purposes of double jeopardy clause].)

offenders' *contact* with children on whom they might prey by ensuring that such persons will not live near where children routinely gather.

Finally, the real-life consequences of the residency restrictions of Jessica's Law may vary widely from person to person, and from case to case. Unlike registration requirements, which demand periodic affirmative acts from all registrants throughout their lifetimes (see *Hofsheier*, *supra*, 37 Cal.4th at p. 1196), the residency restrictions impose no additional obligations on registrants whose domiciles of choice are, and remain, in compliance with Jessica's Law.**15** In sum, these restrictions do not necessarily inflict such onerous disabilities and restraints, or otherwise so resemble common or traditional forms of punishment, that they must be so labeled, for purposes of *Apprendi*, despite their regulatory and nonpunitive intent.

---

**15** In *Taylor*, *supra*, __ Cal.4th ___, the companion case we file today, we address an *as-applied* challenge to the *blanket enforcement* of the residency restrictions of Jessica's Law against registered sex offender parolees in San Diego County. In that case, the trial court heard evidence indicating that in this populous urban community, where dense development renders large areas off-limits for residential purposes, and available, affordable compliant housing is scarce, such blanket enforcement has indeed created widespread harsh conditions that undermine the parolees' liberty and privacy rights while bearing no rational relationship to the statute's regulatory purpose. Under those circumstances, we have concluded the restrictions thus cannot constitutionally be so broadly enforced in that locality, though they may still be imposed and enforced there as justified in individual cases. Here, in a *facial* challenge to the validity, *ab initio*, of an order *individually* imposed on defendant as the result of a judicial determination he is sexually dangerous, we have no competent evidence of the actual effect on him, or on any other nonparolee registered sex offender in the state. Thus, we have neither occasion, nor basis, to conclude that the residency restrictions of Jessica's Law, as applied to him, or generally to such persons throughout California, would produce such harsh effects as to warrant a finding that the restrictions are punitive for purposes of *Apprendi*. (See fn. 12, *ante*.)

We are further persuaded, as the Court of Appeal conceded, that the residency restrictions are rationally related to a legitimate regulatory and nonpunitive government purpose. Unlike the Court of Appeal, however, we find they are not so excessive with respect to this purpose as to require a conclusion that they constitute punishment.

As the high court has explained, a law's "rational connection to a nonpunitive purpose is a 'most significant' factor in our determination that the statute's effects are not punitive." (*Smith v. Doe*, *supra*, 538 U.S. at p. 102.) Here, the Court of Appeal acknowledged that "[t]he residency restriction[s] [of Jessica's Law are] rationally connected to the nonpunitive purpose of protecting children in and around schools and parks." This factor, the court agreed, "weighs against punitive effect." In so concluding, the Court of Appeal was surely correct.

Nonetheless, the Court of Appeal found that the residency restrictions suggest punishment because they are overbroad for their ostensible regulatory purpose. The court reasoned that "[b]arring all registered sex offenders from living near any schools and parks — without considering whether their offenses involved children, whether the exclusion zone provides adequate alternative housing for them, or whether their exclusion from living near schools and parks [actually] provides substantial protection to our children — is excessive to the nonpunitive purpose of child protection."

But "[a] statute is not deemed punitive simply because it lacks a close or perfect fit with the nonpunitive aims it seeks to advance." (*Smith v. Doe*, *supra*, 538 U.S. at p. 103.) The imprecision must be so great, the high court has suggested, as to indicate that the statute's supposed regulatory purpose "is a 'sham or mere pretext' . . . " to impose punishment. (*Ibid.*) Such is not the case here.

At the outset, the residency restrictions of Jessica's Law are not overbroad, and thus punitive, simply because they do not narrow the affected class to those

31

registered sex offenders who are most likely to attack children.  Citing studies similar to those later invoked by Proposition 83 itself, the court in *Smith v. Doe* noted that the risk of recidivism among sex offenders generally "is 'frightening and high' " (*Smith v. Doe*, *supra*, 538 U.S. at p 103.).  Consistent with "grave concerns over the high rate of recidivism among convicted sex offenders and their dangerousness as a class," the court observed, a legislative body can reasonably conclude "that a conviction for a sex offense provides evidence of substantial risk of recidivism." (*Ibid.*)  Thus, a state is not precluded "from making reasonable categorical judgments that conviction of specified crimes should entail particular regulatory consequences." (*Ibid.*)

Similar principles apply to California's scheme for sex offender registration, to which the residency restrictions of Jessica's Law may attach.  An automatic registration requirement applies to conviction of specified serious sex crimes, including lewd acts with minors.  The electorate could reasonably conclude that such persons, as a class, present a general danger of reoffense against which vulnerable children deserve special regulatory protection.

As particularly relevant to the issue before us here, sex offender registration may be imposed in other cases only where, after conducting an individualized assessment, a court finds that the nature of the defendant's crime, and other information about the offender, indicate that he or she, in particular, is sexually dangerous.  Such findings were, of course, made in this case, after defendant was convicted of assaulting a 12-year-old girl.  Here too, the voters could reasonably seek, by nonpunitive regulation, to protect vulnerable children against the risk of recidivism by such an offender.

Nor is it fatal to a finding of legitimate regulation that the residency restrictions are not necessarily the most efficacious and least disruptive approach to affording such protection.  "The excessiveness inquiry . . . is not an exercise in

32

determining whether the [adopter of legislation] has made the best choice possible to address the problem it seeks to remedy. The question is whether the regulatory means chosen are reasonable in light of the nonpunitive objective." (*Smith v. Doe*, *supra*, 538 U.S. at p. 105.)[16]

The residency restrictions of Jessica's Law meet this standard. Defendant fails to establish, by the "clearest proof," that the restrictions are facially punitive in intent or effect. For this independent reason, we conclude that they are not subject to the jury trial provisions of *Apprendi*.[17]

---

[16] This principle is analogous to the general rule that a law will not be deemed facially unreasonable for a legitimate government purpose simply because it may arguably be unwise or improvident, or because it may have produced unforeseen or unintended consequences. (See, e.g., *FCC v. Beach Communications, Inc.* (1993) 508 U.S. 307, 314; *Vance v. Bradley* (1979) 440 U.S. 93, 97; but see *Taylor*, *supra*, ___ Cal.4th ___ [as-applied challenge].)

[17] Though the authority from other jurisdictions is not unanimous, a substantial number of federal and state cases, relying prominently on *Smith v. Doe*, have concluded that sex offender residency restrictions similar to California's are legitimate regulatory measures, and are not facially punitive. (E.g., *Weems v. Little Rock Police Dept.* (8th Cir. 2006) 453 F.3d 1010, 1017 [Ark. law; ex post facto challenge; residency restrictions apply to offenders administratively screened for high risk of reoffense]; *Doe v. Miller* (8th Cir. 2005) 405 F.3d 700, 718-723 [Iowa law; ex post facto challenge; statute includes "grandfather" provision]; *John Does 1-4 v. Snyder* (E.D.Mich. 2013) 932 F.Supp.2d 803, 810-814 [ex post facto challenge]; *Gautier v. Jones* (W.D.Okla. 2009) 2009 WL 1444533 , at pp. *4-*9 [ex post facto challenge]; *McAteer v. Riley* (M.D.Ala. 2008) 2008 WL 898932, at pp. *2-*5 [ex post facto challenge]; *Doe v. Baker* (N.D.Ga. 2006) 2006 WL 905368, at pp. *3-*6 [ex post facto challenge; restrictions upheld despite absence of "grandfather" provision]; *Coston v. Petro* (S.D.Ohio 2005) 398 F.Supp.2d 878, 885-887 [ex post facto challenge]; *State v. Seering* (Iowa 2005) 701 N.W.2d 655, 667-669 [ex post facto challenge]; *Lee v. State* (Ala. 2004) 895 So.2d 1038, 1041-1043 [ex post facto challenge]; but see, e.g., *Mikaloff*, *supra*, 2007 WL 2572268, at pp. *3-*12 [upholding ex post facto challenge to Ohio residency restrictions]; *State v. Pollard* (Ind. 2009) 908 N.E.2d 1145, 1148-1154 [finding residency restrictions punitive as applied to offender who owned and was living in

*(footnote continued on next page)*

## C.  Separate validity of registration order.

Even were we to determine, under *Apprendi*, that the residency restrictions of Jessica's Law cannot apply to defendant because they are not supported by jury findings, it would not follow that the registration order imposed on defendant by the trial judge under section 290.006 must be struck.  Because sex offender registration orders are not punishment in and of themselves, their imposition is not subject to *Apprendi*.  (See text discussion, *ante*.)  This circumstance is not altered, depending on whether residency restrictions validly attach to such an order by operation of Jessica's Law.  Thus, as the People observe, any conclusion that the residency restrictions could not constitutionally be applied to defendant would not create "a constitutional bar to having a judge exercise his or her discretion to determine whether [defendant] should . . . be subject to registration." (*Picklesimer*, *supra*, 48 Cal.4th at p. 344.)  In other words, the judge-imposed registration order remains separately valid and extant, even if *Apprendi* would prevent it from including the residency restrictions of Jessica's Law.  For this additional reason, the Court of Appeal erred in striking the order.

---

*(footnote continued from previous page)*

noncompliant home when restrictions were adopted]; *Com. v. Baker* (Ky. 2009) 295 S.W.3d 437, 443-447 [upholding ex post facto challenge].)

## CONCLUSION

The judgment of the Court of Appeal is reversed insofar as it modified defendant's conviction by striking the sex offender registration requirement, and is otherwise affirmed.

**BAXTER, J.***

**WE CONCUR:**

**CANTIL-SAKAUYE, C. J.**
**CHIN, J.**
**CORRIGAN, J.**
**GROVER, J.****

---

\*     Retired Associate Justice of the Supreme Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.

**\*\***     Associate Justice of the Court of Appeal, Sixth Appellate District, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.

**CONCURRING AND DISSENTING OPINION BY LIU, J.**

The jury in this case acquitted defendant Steven Lloyd Mosley of committing a lewd act on a child under the age of 14 but convicted him of simple assault. Thereafter the trial judge found that Mosley "committed the offense as a result of sexual compulsion or for purposes of sexual gratification" and ordered him to register as a sex offender. (Pen. Code, § 290.006.) The registration order made Mosley subject to the residency restriction of Penal Code section 3003.5, subdivision (b), which prohibits any registered sex offender from living within 2,000 feet of a school or park.

Mosley argues that under *Apprendi v. New Jersey* (2000) 530 U.S. 466 (*Apprendi*), he was entitled to have a jury, not a judge, determine the facts supporting the registration order and residency restriction. In rejecting this claim, today's opinion avoids deciding whether the residency restriction applies to Mosley — a *statutory* question — in order to decide not one but two *constitutional* questions concerning *Apprendi*'s applicability. Because the court's methodology is as flawed as its holdings, I respectfully dissent. Section 3003.5, subdivision (b) applies to all registered sex offenders, including Mosley, and its imposition here required a determination of facts that historically lay within the jury's domain. Mosley has stated a valid *Apprendi* claim because the residency restriction is a penalty that exceeds what the jury's verdict in this case permits.

1

In this appeal, the Attorney General argues that Penal Code section 3003.5, subdivision (b) (hereafter section 3003.5(b)) applies only to registered sex offenders who are on parole and not to misdemeanor probationers like Mosley. (All undesignated statutory references are to the Penal Code.) If the Attorney General is correct, we need not go further to decide whether the residency restriction was imposed in violation of *Apprendi*. So the first question we must decide is whether section 3003.5(b) applies to sex offenders who are not on parole. Today's opinion avoids this threshold statutory question. Instead, the court assumes that section 3003.5(b) applies to registered sex offenders not on parole and proceeds to reject Mosley's *Apprendi* claim. (Maj. opn., *ante*, at pp. 11–12.) This approach is highly unorthodox.

"If there is one doctrine more deeply rooted than any other in the process of constitutional adjudication, it is that we ought not to pass on questions of constitutionality" unless those questions are "unavoidable." (*Spector Motor Co. v. McLaughlin* (1944) 323 U.S. 101, 105; see *Bond v. United States* (2014) 572 U.S. __, __ [134 S.Ct. 2077, 2087]; *Lyng v. Northwest Indian Cemetery Prot. Assn.* (1988) 485 U.S. 439, 445–446; *Escambia County v. McMillan* (1984) 466 U.S. 48, 51.) This doctrine promotes judicial restraint and minimizes the potential for friction between the judiciary and the political branches. (See *National Federation of Independent Business v. Sebelius* (2012) 567 U.S. __, __ [132 S.Ct. 2566, 2593].) Like the high court, this court has regularly said that we will "not reach constitutional questions unless absolutely required to do so." (*People v. Williams* (1976) 16 Cal.3d 663, 667; see *Verdin v. Superior Court* (2008) 43 Cal.4th 1096, 1102; *People v. Brown* (2003) 31 Cal.4th 518, 534; *Transportation Authority v. Guardino* (1995) 11 Cal.4th 220, 230; *In re Michael G.* (1988) 44

Cal.3d 283, 295; *People v. Leonard* (1983) 34 Cal.3d 183, 187.) When there is a "statutory basis" for resolving a case, we will not "render[] a decision on constitutional grounds." (*NBC Subsidiary (KNBC-TV), Inc. v. Superior Court* (1999) 20 Cal.4th 1178, 1190; see *College Hospital Inc. v. Superior Court* (1994) 8 Cal.4th 704, 720–721; *De Lancie v. Superior Court* (1982) 31 Cal.3d 865, 877 & fn. 13; *People v. Gilbert* (1969) 1 Cal.3d 475, 484–485; *Palermo v. Stockton Theatres* (1948) 32 Cal.2d 53, 66.)

Against this mountain of precedent, the court invents a doctrine of *statutory* avoidance: It avoids an issue of statutory interpretation in order to resolve the case on constitutional grounds. But, as the court does not dispute, no such doctrine appears in the case law or in any treatise on statutory interpretation. (See, e.g., 2A–3 Sutherland, Statutes and Statutory Construction (7th ed. 2014) §§ 45:1–65:5; Scalia & Garner, Reading Law: The Interpretation of Legal Texts (2012).) The recognized canons of construction are so wide-ranging that it has been said "for every canon . . . there is an equal and opposite canon." (Posner, *Statutory Interpretation—In the Classroom and in the Courtroom* (1983) 50 U. Chi. L.Rev. 800, 806, citing Llewelyn, The Common Law Tradition (1960) pp. 521–535.) And yet, the canon that a court should avoid a constitutional issue if the case can be decided on statutory grounds has no complement that says a court should avoid a statutory issue if the case can be decided on constitutional grounds. Such an approach has long been rejected. (See *Liverpool, N.Y. & P.S.S. Co. v. Emigration Comrs.* (1885) 113 U.S. 33, 39.)

Today's decision says we need not decide the statutory question "in advance of any concrete evidence of prosecutors' intent to press charges against nonparolee sex offender registrants for noncompliance with the residency restrictions." (Maj. opn., *ante*, at p. 11.) In essence, the court says the statutory

3

issue is not ripe for decision, even as it insists that the constitutional issue arising from a hypothetical reading of the statute *is* ripe. (Maj. opn., *ante*, at p. 12, fn. 7.) But the Attorney General acknowledged at oral argument that she knew of at least one case in which a probationer has been charged with violating the statute. And in any event, the statutory question is squarely presented by Mosley's claim that section 3003.5(b) *on its face* imposes punishment on all registered sex offenders. That claim — unlike the "constitutional challenges to section 3003.5(b) *as a parole condition*" in *In re E.J.* (2010) 47 Cal.4th 1258 (maj. opn., *ante*, at p. 11, fn. 7, italics added) — requires us to decide whether the statute applies to registrants who are not on parole. The answer to that question does not turn on whether prosecutors intend to apply the statute to any particular person or group.

Had the court properly engaged the statutory question, it would have found a clear answer in the text of section 3003.5(b): "Notwithstanding any other provision of law, it is unlawful for *any person for whom registration is required* pursuant to Section 290 to reside within 2000 feet of any public or private school, or park where children regularly gather." (Italics added.) The term "any person for whom registration is required" is unqualified and thus includes registered sex offenders who are not on parole.

The Attorney General contends that a literal reading of section 3003.5(b) would undermine the statute's purpose of protecting the public and would clash with other provisions of section 3003.5. According to her briefing, reading section 3003.5(b) to apply to any registered sex offender, not just parolees, would increase the rate of transience among sex offenders. This would make monitoring and rehabilitation more difficult, thus inhibiting efforts to solve crimes and reduce recidivism. Moreover, the Attorney General notes that section 3003.5 appears in a chapter of the Penal Code dealing with parole conditions and that the only

4

provision of section 3003.5 that existed before Proposition 83 took effect was subdivision (a), which prohibits a sex offender registrant "released on parole" from living with another registrant in a "single family dwelling." If the voters truly intended section 3003.5(b) to apply to "any person for whom registration is required," she argues, it is not clear why they put it in section 3003.5 rather than section 290, which sets forth sex offender registration requirements.

But there is no inconsistency in section 3003.5 between subdivision (a), which sets forth a residency restriction as a parole condition, and subdivision (b), which sets forth a different residency restriction that applies to parolees and nonparolees alike. Moreover, whether or not applying a residency restriction to all registered sex offenders is an effective way to promote public safety, the voters evidently believed it would be.

To the extent there is any ambiguity in the statute, we may look "to extrinsic sources such as ballot summaries and arguments for insight into the voters' intent." (*Kwikset Corp. v. Superior Court* (2011) 51 Cal.4th 310, 321.) Nothing in the ballot materials on Jessica's Law suggests that the voters intended to limit section 3003.5(b) to parolees. The official summary of the measure says Proposition 83 "[p]rohibits *registered sex offenders* from residing within 2,000 feet of any school or park." (Voter Information Guide, Gen. Elec. (Nov. 7, 2006) official title and summary of Prop. 83, p. 42, italics added.) Similarly, the Legislative Analyst explained that the measure "bars *any person* required to register as a sex offender from living within 2,000 feet (about two-fifths of a mile) of any school or park" and that "[a] violation of this provision would be a misdemeanor offense, *as well as a parole violation for parolees*." (*Id.*, analysis of Prop. 83 by Legis. Analyst, p. 44, italics added.) These statements suggest that

5

section 3003.5(b) applies to any registered sex offender, including those not on parole — just as the statute says.

## II.

Having determined that section 3003.5(b) applies to Mosley, I now turn to his *Apprendi* claim. Today's decision holds that "the effect of *Apprendi* on the residency restrictions of Jessica's Law is obviated by a post-*Apprendi* decision, *Oregon v. Ice* (2009) 555 U.S. 160 (*Ice*)." (Maj. opn., *ante*, at p. 4.) But the court misreads the *Apprendi* line of cases, including *Ice*.

*Apprendi* held that "[o]ther than the fact of a prior conviction, any fact that increases the penalty for a crime beyond the prescribed statutory maximum must be submitted to a jury, and proved beyond a reasonable doubt." (*Apprendi*, *supra*, 530 U.S. at p. 490.) The high court reached this holding in the context of a New Jersey hate crime statute that prescribed longer sentences if a judge found by a "preponderance of the evidence" that the defendant committed an offense " 'with a purpose to intimidate an individual or group of individuals because of race, color, gender, handicap, religion, sexual orientation or ethnicity.' " (*Id.* at pp. 468–469.) Allowing the imposition of this enhanced penalty based on judicial factfinding violated the defendant's right to a jury trial under the Sixth Amendment to the United States Constitution. (*Id.* at pp. 490–492.)

Subsequently, the high court in *Ice* held that, while a jury must determine the "facts that warrant punishment for a specific statutory offense," a judge may determine the facts that warrant consecutive rather than concurrent sentences for multiple offenses. (*Ice*, *supra*, 555 U.S. at p. 170.) *Ice* explained that *Apprendi*'s "animating principle is the preservation of the jury's historic role as a bulwark between the State and the accused at the trial for an alleged offense. [Citation.] Guided by that principle, our opinions make clear that the Sixth Amendment does

6

not countenance legislative encroachment on the jury's traditional domain. [Citation.]  We accordingly considered whether the finding of a particular fact was understood as within 'the domain of the jury . . . by those who framed the Bill of Rights.' [Citation.]" (*Ice*, *supra*, 555 U.S. at p. 168.)

Applying this inquiry in *Ice*, the high court said "[t]he historical record demonstrates that the jury played no role in the decision to impose sentences consecutively or concurrently.  Rather the choice rested exclusively with the judge. [Citations.]" (*Ice*, *supra*, 555 U.S. at p. 168.)  "In light of this history, legislative reforms regarding the imposition of multiple sentences do not implicate the core concerns that prompted our decision in *Apprendi*.  There is no encroachment here by the judge upon facts historically found by the jury, nor any threat to the jury's domain as a bulwark at trial between the State and the accused." (*Id.* at p. 169.)

Today's opinion says that "[h]ere, as in *Ice*, there is no *jury* tradition connected to the sentencing decision at issue." (Maj. opn., *ante*, at p. 20.) "Instead, both residency restrictions and underlying sex offender registration requirements are modern regulatory sentencing imperatives unknown at common law. . . .  They are additional examples of 'sentencing choices or accoutrements' ([*Ice*, *supra*, 555 U.S.] at p. 172) in which juries have played no historical role, and which do not implicate the Sixth Amendment jury trial guarantee within the meaning of *Apprendi*." (*Id.* at p. 19.)  This is unpersuasive for several reasons.

As an initial matter, the high court in *Ice* observed that all of its prior decisions applying *Apprendi*'s rule "involved sentencing for a discrete crime, not—as [in *Ice*]—for multiple offenses different in character or committed at different times." (*Ice*, *supra*, 555 U.S. at p. 167.)  Whereas "the determination of facts that warrant punishment for a specific statutory offense" fell within the jury's

7

traditional role (*id.* at p. 170), "administering multiple sentences" on multiple offenses did not (*id.* at p. 168). The case before us involves sentencing for a specific statutory offense, not multiple offenses.

More fundamentally, today's decision misreads *Ice* when it reasons that, like the administration of multiple sentences, "sex offender registration and residency requirements are not sentencing matters in which, historically, the jury has played any traditional role at common law." (Maj. opn., *ante*, at pp. 18–19.) In saying that "the scope of the constitutional jury right must be informed by the historical role of the jury at common law" (*Ice*, *supra*, 555 U.S. at p. 170), *Ice* did not suggest that the scope of the Sixth Amendment turns on whether common law juries imposed particular sentences. Rather, *Ice* made clear that the historical inquiry focuses on "whether *the finding of a particular fact* was understood as within 'the domain of the jury.' " (*Ice*, at p. 168, italics added; see *id.* at p. 170 ["*Apprendi*'s core concern" is "a legislative attempt to 'remove from the [province of the] jury' *the determination of facts* that warrant punishment for a specific statutory offense." (italics added)].) The fact that juries historically did not make a particular sentencing decision was evidence that a defendant had no entitlement to have a jury make *the factual determinations* underlying the sentencing decision. In *Ice*, the fact that "the jury played no role in the decision to impose sentences consecutively or concurrently" meant that a judge could find the facts required to impose consecutive sentences without "encroach[ing] . . . upon *facts historically found by the jury*." (*Id.* at pp. 168, 169, italics added.)

In *Southern Union Co. v. United States* (2012) 567 U.S. __ [132 S.Ct. 2344] (*Southern Union*), the high court reaffirmed that the salient historical inquiry is whether the determination of facts authorizing a particular sentence lay within the jury's domain. *Southern Union* involved a federal statute pegging

8

criminal fines to the duration of the violation.  The question was "whether [*Apprendi*'s] rule applies to sentences of criminal fines."  (*Id.* at p. __ [132 S.Ct. at pp. 2348–2349].)  The high court held that although some fines are not substantial enough to trigger the protections of the Sixth Amendment, "[w]here a fine is substantial enough . . . , *Apprendi* applies in full."  (*Southern Union*, at p. __ [132 S.Ct. at p. 2352].)  In so holding, the high court reiterated that "*Apprendi*'s 'core concern' is to reserve to the jury 'the determination of facts that warrant punishment for a specific statutory offense.'  *Ice*, 555 U.S., at 170."  (*Id.* at p. __ [132 S.Ct. at p. 2350].)  *Southern Union* further explained:  "In stating *Apprendi*'s rule, we have never distinguished one form of punishment from another.  Instead, our decisions broadly prohibit judicial factfinding that increases maximum criminal 'sentence[s],' 'penalties,' or 'punishment[s]'—terms that each undeniably embrace fines.  [Citations.]"  (*Id.* at p. __ [132 S.Ct. at p. 2351].)

The high court acknowledged that "judges in the colonies and during the founding era 'possessed a great deal of discretion' in determining whether to impose a fine and in what amount."  (*Southern Union*, *supra*, 567 U.S. at p. __ [132 S.Ct. at p. 2353].)  But the fact that historically "[t]he judge, not the jury, would normally determine fine-related sentencing facts" (*id.* at p. __ [132 S.Ct. at p. 2369 (dis. opn. of Breyer, J.)) was not sufficient to make *Apprendi* inapplicable to criminal fines.  Instead, the high court said "the salient question here is what role the jury played in prosecutions for offenses that did peg the amount of a fine to the determination of specified facts—often, the value of damaged or stolen property."  (*Id.* at p. __ [132 S.Ct. at p. 2353].)  On this question, the court concluded that "juries routinely found facts that set the maximum amounts of fines" (*id.* at p. __ [132 S.Ct. at p. 2356]), citing several historical examples (*id.* at pp. __–__ [132 S.Ct. at pp. 2353–2354]).  Although none of the examples

9

concerned the jury's role in determining the duration of a criminal violation, the court did not hesitate to conclude that the Sixth Amendment requires such a factual determination to be made by a jury.

Thus, the applicability of *Apprendi*'s rule does not depend on "distinguish[ing] one form of punishment from another" (*Southern Union*, *supra*, 567 U.S. at p. __ [132 S.Ct. at p. 2351]), nor does it require historical proof that juries as opposed to judges generally imposed a particular punishment or that juries ever made the exact same factual finding as the one at issue. Moreover, it does not matter that a particular sentencing decision was "unknown at common law" (maj. opn., *ante*, at p. 19), for the same could be said of the hate crime sentencing enhancement in *Apprendi* itself. (See *Apprendi*, *supra*, 530 U.S. at p. 478 ["Any possible distinction between an 'element' of a felony offense and a 'sentencing factor' was unknown to the practice of criminal indictment, trial by jury, and judgment by court as it existed during the years surrounding our Nation's founding."].) The Sixth Amendment right to a jury trial cannot be rendered inapplicable simply by legislative development of "modern" punishments (maj. opn., *ante*, at p. 19) or by "the novelty of a legislative [sentencing] scheme" (*Apprendi*, at p. 482). While acknowledging that "trial practices [may] change in the course of centuries," *Apprendi* made clear that "practice must at least adhere to the basic principles undergirding the requirements of trying to a jury all facts necessary to constitute a statutory offense, and proving those facts beyond reasonable doubt." (*Id.* at pp. 483–484.)

Nor does it help to call sex offender registration and residency requirements " 'sentencing . . . accoutrements' " akin to " 'supervised release following service of a prison sentence' " or " 'required attendance at drug rehabilitation programs or terms of community service.' " (Maj. opn., *ante*, at p. 19, quoting *Ice*, *supra*, 555

10

U.S. at p. 171.)  The high court in *Southern Union* suggested that this language from *Ice* was dicta and "more likely refers to the routine practice of judges' imposing [sentencing options] from within a range authorized by jury-found facts" — a practice that "poses no problem under *Apprendi* because the penalty does not exceed what the jury's verdict permits." (*Southern Union*, *supra*, 567 U.S. at p. __, fn. 5 [132 S.Ct. at p. 2352, fn. 5].)  The essential inquiry in *Apprendi*, as in *Southern Union*, was whether the "legislative scheme . . . removes the jury from the determination of a fact that, if found, exposes the criminal defendant to a penalty *exceeding* the maximum he would receive if punished according to the facts reflected in the jury verdict alone." (*Apprendi*, *supra*, 530 U.S. at pp. 482–483; see *Southern Union*, at pp. __–__ [132 S.Ct. at pp. 2350–2351].)

The case before us is squarely analogous to *Apprendi* in a crucial respect: Imposition of the sex offender registration requirement and residency restriction, like the hate crime sentence enhancement in *Apprendi*, turns on a finding of the defendant's motive or intent.  (See *Apprendi*, *supra*, 530 U.S. at p. 494 ["it does not matter whether the required finding is characterized as one of intent or of motive"].)  Section 290.006 authorizes a court to require registration "if the court finds at the time of conviction or sentencing that the person committed the offense *as a result of sexual compulsion or for purposes of sexual gratification*." (Italics added.)  "By its very terms, this statute mandates an examination of the defendant's state of mind—a concept known well to the criminal law as the defendant's *mens rea*." (*Apprendi*, at p. 492.)  The key historical question — "whether the finding of a particular fact was understood as within 'the domain of the jury . . . by those who framed the Bill of Rights' " (*Ice*, *supra*, 555 U.S. at p. 168) — has an easy answer in this case.  (Whether "the defendant's likelihood of reoffense" must also be found by a jury (maj. opn., *ante*, at p. 21) is not before

11

us today, and we have never decided whether such a finding is necessary to expose a defendant to discretionary registration under section 290.006.)

In sum, the circumstances here directly implicate *Apprendi*'s rule. The jury acquitted Mosley of committing a lewd act on a child under the age of 14 — an offense requiring proof of sexual intent (§ 288, subd. (a)) — and instead convicted him of simple assault (§ 240). A simple assault conviction, by itself, does not result in any registration requirement or residency restriction. The "effect" of the judge's finding under section 290.006 was to "expose the defendant to a greater punishment than that authorized by the jury's guilty verdict." (*Apprendi*, *supra*, 530 U.S. at p. 494.) At least that is so if, as Mosley contends, section 3003.5(b)'s residency restriction constitutes punishment under the Sixth Amendment.

**III.**

Turning to this last question, I agree with the Court of Appeal that the residency restriction is punitive based on the factors set forth in *Kennedy v. Mendoza-Martinez* (1963) 372 U.S. 144, 168–169 (*Mendoza-Martinez*). Applying those factors, the high court in *Smith v. Doe* (2003) 538 U.S. 84, 97–106 (*Smith*) held that Alaska's sex offender registration scheme was not punitive for purposes of the ex post facto clause, and this court has reached the same conclusion about California's sex offender registration requirements for purposes of the Sixth Amendment (*People v. Picklesimer* (2010) 48 Cal.4th 330, 343–344 (*Picklesimer*)). But section 3003.5(b)'s residency restriction goes beyond registration requirements and imposes more severe burdens that drive the analysis toward a different result.

In first determining the voters' intent behind section 3003.5(b), today's opinion acknowledges that Proposition 83 "did not specifically state why the voters adopted the residency restrictions in particular" and that Proposition 83's

12

official title and findings "suggest that, overall, the electorate had a mix of punitive, deterrent, and protective motives." (Maj. opn., *ante*, at p. 25.) Nevertheless, the court puts decisive weight on the ballot arguments of Proposition 83's supporters, while dismissing the fact that Proposition 83 placed the residency restriction in the Penal Code and made its violation a criminal offense. (Maj. opn., *ante*, at pp. 25–26; cf. *Smith*, *supra*, 538 U.S. at p. 94 ["formal attributes of a legislative enactment, such as the manner of its codification or the enforcement procedures it establishes, are probative of the legislature's intent" though "not dispositive"].)

On balance, I believe the voters primarily intended section 3003.5(b) as a regulatory measure. But this nonpunitive intent is not stated as clearly or as conclusively as when a legislature "expresse[s] the objective of the law in the statutory text itself." (*Smith*, *supra*, 538 U.S. at p. 93.) As a result, the Court of Appeal was right to question whether the " ' "clearest proof" ' " of punitive effect is necessary to outweigh the voters' apparent intent. (*Id.* at p. 92; see *id.* at p. 110 (conc. opn. of Souter, J.); *id.* at pp. 114–115 (dis. opn. of Ginsburg, J.).) Ultimately, however, we need not resolve the appropriate standard because even if the clearest proof is required, the *Mendoza-Martinez* factors decisively show that section 3003.5(b) is punitive in effect.

Here, as in *Smith*, "[t]he factors most relevant to our analysis are whether, in its necessary operation, the regulatory scheme: has been regarded in our history and traditions as a punishment; imposes an affirmative disability or restraint; promotes the traditional aims of punishment; has a rational connection to a nonpunitive purpose; or is excessive with respect to this purpose." (*Smith*, *supra*, 538 U.S. at p. 97.) These factors are " 'neither exhaustive nor dispositive,' " but are " 'useful guideposts.' " (*Ibid.*, citations omitted.) In applying these factors,

13

we must evaluate the effects of section 3003.5(b) in light of its applicability to all registered sex offenders, not just offenders like Mosley whose victims were children.  (See *Mendoza-Martinez*, *supra*, 372 U.S. at p. 169 ["these factors must be considered in relation to the statute on its face"].)

In assessing whether a residency restriction "has been regarded in our history and traditions as a punishment" (*Smith*, *supra*, 538 U.S. at p. 97), the Court of Appeal said it "is sufficiently close to banishment, property deprivation, and a probation condition to be deemed traditional punishment."  These semblances are discernible but inexact.  Unlike banishment, which directly forbids offenders from "return[ing] to their original community" (*Smith*, at p. 98), section 3003.5(b) declares certain areas off-limits for establishing a home but not for any other purpose.  Unlike "the punitive confiscation of property," which traditionally involves a fine or seizure of land specifically intended to burden the defendant's property interests (e.g., *Nixon v. Administrator of General Services* (1977) 433 U.S. 425, 474 & fn. 38), the deprivation of property interests worked by section 3003.5(b) seems incidental to the statute's main purpose of restricting liberty.  And unlike probation or parole, which involves conditional release and ongoing supervision (see *Smith*, at p. 101), section 3003.5(b) establishes an independent legal obligation without individualized supervision or constructive custody.  Comparing the residency restriction to traditional forms of punishment does not strongly suggest it is punitive.

By contrast, section 3003.5(b) clearly "imposes an affirmative disability or restraint" that suggests its punitive character.  (*Smith*, *supra*, 538 U.S. at p. 97.) "Here, we inquire how the effects of the [statute] are felt by those subject to it." (*Id.* at pp. 99–100.)  Unlike a registration requirement, which "imposes no physical restraint" and "leaves [sex offenders] free to change . . . residences" (*id.*

14

at p. 100), the residency restriction directly limits where sex offenders may live and establish a home. In addition, whereas the registration scheme in *Smith* disclosed and disseminated information that was "already a matter of public record" (*id.* at p. 101), section 3003.5(b) imposes on sex offenders a burden that is separate from and additional to all other requirements with which they must comply.

Moreover, section 3003.5(b) predictably results in severe geographic limitations on compliant housing in densely populated areas, as our decision today in *People v. Taylor* (Mar. 2, 2015, S206143) __ Cal.4th __ (*Taylor*) confirms. (See *id.*, at p. __ [at p. 24] [section 3003.5(b) "effectively barred petitioners access to approximately 97 percent of the multifamily rental housing units in San Diego County that would otherwise be available to them"]; see also Cal. Sex Offender Management Bd., Homelessness Among Cal. Registered Sex Offenders: An Update (Sept. 2011) p. 7 (hereafter 2011 Update) ["A number of metropolitan areas have developed maps showing the areas where, according to the language of Prop. 83, affected sex offenders may not live. Observers agree that the vast majority of potential housing locations in urban areas are now included in the off-limits territory. San Francisco, for example, has virtually no realistic places where a paroled sex offender may legally live."].)

The breadth of the restriction has "led to dramatically escalating levels of homelessness among sex offenders." (2011 Update, *supra*, at p. 1; see *id.* at p. 7 [sex offenders registered as transient nearly tripled from 2,050 in 2007 (just after Jessica's Law was passed) to 6,012 in 2011]; *Taylor*, *supra*, __ Cal.4th at p. __ [at pp. 25–26].) For many sex offenders, the residency restriction also adversely affects access to transportation, employment opportunities, health care, drug and alcohol rehabilitation programs, and other social services. (See *Taylor*, at p. __ [at

15

pp. 24–25].)  And even among those who are able to obtain compliant housing and access to needed services, a restriction on where one may choose to establish a home can itself work a significant deprivation.  (See *Kelo v. City of New London* (2005) 545 U.S. 469, 494–495 (dis. opn. of O'Connor, J.); *City of Cleburne v. Cleburne Living Center* (1985) 473 U.S. 432, 473 (*Cleburne*) (conc. & dis. opn. of Marshall, J.).)  Unlike similar laws in other states, section 3003.5(b) contains no provision allowing a sex offender to stay in a home that he or she owned before the law's enactment, before the sex offense conviction, or before a newly located school or park is established in the area.  (Cf., e.g., Iowa Code tit. XVI, § 692A.114, subd. 3.c., d.); 720 Ill. Comp. Stat. ch. 720, § 5/11–9.3(b-5); Okla. Stat. tit. 57, § 590, subd. (A).)

Today's opinion acknowledges the realities described in *Taylor*, which addressed an as-applied challenge, but disclaims any awareness of how section 3003.5(b) generally affects sex offenders throughout the state.  (Maj. opn., *ante*, at p. 30, fn. 15.)  The court says the terms of the residency restriction are "potentially burdensome" but "limited" because they "do not regulate a registered sex offender's daily activities" and "do not dictate where he or she may travel, visit, shop, eat, work, or play."  (*Id.* at pp. 27–28.)  This blinks reality and common sense.

If the only real effect of the residency restriction were to control where sex offenders may sleep at night, leaving them free to spend their waking hours near parks and schools, then Jessica's Law would have been an idle enactment.  Clearly, the desired and anticipated effect of the law was to keep sex offenders away from neighborhoods where children play or attend school — not just at night, but at all times.  (See Voter Information Guide., Gen Elec. (Nov. 7, 2006), argument in favor of Prop. 83, p. 46 [Prop. 83 will "keep[] [child molesters] away

16

from schools and parks" and will "[c]reate predator free zones around schools and parks" (capitalization and italics omitted)].) By prohibiting sex offenders from living near schools or parks, section 3003.5(b) has the effect of eroding or severing their ties to the community and ordinary civic life. (See *Pleasant Grove City v. Summum* (2009) 555 U.S. 460, 469 [parks are traditional public forums " 'used for purposes of assembly, communicating thoughts between citizens, and discussing public questions' "]; *Cleburne*, *supra*, 473 U.S. at p. 461, fn. 5 (conc. & dis. opn. of Marshall, J.) [group home for mentally retarded persons "was specifically located near a park, a school, and a shopping center so that its residents would have full access to the community at large"]; *Evans v. Newton* (1966) 382 U.S. 296, 301–302 [a park is a "public facility" that "serves the community" and can play "an integral part" of a city's activities]; Ed. Code, § 38131, subd. (a) [each school is "a civic center"]; Presidential Com. on Election Admin., The American Voting Experience: Rep. and Recommendation of the Presidential Commission on Election Administration (Jan. 2014) p. 33 ["schools [are] the preferred venue for polling places"].) To say that section 3003.5(b) "do[es] not regulate a registered sex offender's daily activities" (maj. opn., *ante*, at p. 28) provides no realistic appraisal of "how the effects of the [statute] are felt by those subject to it." (*Smith*, *supra*, 538 U.S. at pp. 99–100.) The effect, even if not the intent, of the residency restriction is to ostracize sex offenders as "pariahs who do not belong in the community." (*Cleburne*, at p. 473 (conc. & dis. opn. of Marshall, J.).)

The nature and severity of these burdens inform whether section 3003.5(b) "promote[s] the traditional aims of punishment—retribution and deterrence." (*Mendoza-Martinez*, *supra*, 372 U.S. at p. 168.) Although "[a]ny number of governmental programs might deter crime without imposing punishment" (*Smith*,

17

*supra*, 538 U.S. at p. 102), the residency restriction hardly qualifies as ordinary government regulation.  As noted, whereas the registration requirement in *Smith* publicized "information about the individual's conviction [that] was already in the public domain" (*id.* at p. 100), the residency restriction imposes greater and qualitatively different burdens than a registration requirement.  To the extent that potential offenders weigh the costs and benefits of criminal conduct, the lifetime disabilities resulting from the residency restriction substantially increase the costs of sexual offenses and thereby promote deterrence.  Moreover, it is significant that section 3003.5(b) "makes no individualized determination of the dangerousness of a particular registrant. . . .  When a restriction is imposed equally upon all offenders, with no consideration given to how dangerous any particular registrant may be to public safety, that restriction begins to look far more like retribution for past offenses than a regulation intended to prevent future ones."  (*Commonwealth v. Baker* (Ky. 2009) 295 S.W.3d 437, 444 (*Baker*) [finding similar residency restriction (Ky. Rev. Stat. tit. III § 17.545) to be punitive for purposes of ex post facto analysis].)

The remaining factors are whether section 3003.5(b) "has a rational connection to a nonpunitive purpose" and whether it "is excessive with respect to this purpose."  (*Smith*, *supra*, 538 U.S. at p. 97.)  Today's opinion effectively collapses these two factors into one:  It finds the residency restriction rationally connected to protecting children around schools and parks, and it then finds no excessiveness by analogizing the inquiry to ordinary rational basis review.  (Maj. opn., *ante*, at p. 32 ["The electorate could reasonably conclude . . . ."]; *id.* at p. 33, fn. 16, citing *FCC v. Beach Communications, Inc.* (1993) 508 U.S. 307, 314.)  But the inquiry here focuses on the *effects* of the statute, not whether there is some " 'conceivable basis which might support it.' "  (*Beach Communications*, at

18

p. 315.)  In stating that "[t]he question is whether the means chosen are reasonable in light of the nonpunitive objective" (*Smith*, at p. 105), *Smith* drew no analogy between the excessiveness inquiry and rational basis review.  Instead, the high court evaluated reasonableness in this context by reference to the statute's actual workings and empirical underpinnings.  (*Id.* at pp. 103–105.)

Although section 3003.5(b)'s nonpunitive purpose of protecting children is not a sham or pretext for imposing punishment, the residency restriction is plainly excessive with respect to that purpose.  The most conspicuous feature of section 3003.5(b) in this regard is its categorical applicability to *all* registered sex offenders — regardless of whether the offender ever targeted children, regardless of whether the offense was violent or nonviolent, regardless of risk profile. Section 3003.5(b) differs from analogous residency restrictions that limit their applicability to sex offenders whose crimes involved children.  (See, e.g., Del. Code tit. 11, § 1112, subds. (a), (b)(4); Fla. Stat. tit. XLVI, § 775.215, subds. (2)(a), (3)(a); Ind. Code tit. 35, § 35-42-4-11, subd. (a); Iowa Code tit. XVI, § 692A.114, subd. 1.c.; S.C. Code tit. 23, § 23-3-535, subd. (B).) And it differs from analogous restrictions that limit their applicability to sex offenders who have committed a certain level of aggravated offense or who have been assessed as meeting a certain threshold of dangerousness.  (See, e.g., Ark. Code tit. 5, § 5-14-128, subd. (a); Neb. Rev. Stat. ch. 29 §§ 29-4016, subds. (4), (5), 29-4017, subd. (1).)

The indiscriminate character of section 3003.5(b) also stands in contrast to the differentiated approach set forth in the community notification provisions of California's sex offender registration statute.  Under section 290.46, the state Department of Justice must maintain a public website that provides information about registered sex offenders.  This website contains a wealth of information

19

about individuals convicted of the most serious sex crimes, including their names, photographs, and addresses. (§ 290.46, subd. (b).) However, the website displays less information about individuals who pose a lower risk to the community. For example, it provides the ZIP codes but not the addresses of some offenders. (§ 290.46, subds. (c), (d)). And the lowest risk offenders may file an application to have all of their information removed from the website. (§ 290.46, subd. (e).) These provisions are designed to protect communities from dangerous individuals without intruding more than necessary on the privacy rights of low risk offenders. Section 3003.5(b), by contrast, imposes the same onerous restraint on all sex offenders, even those who pose such a low risk of recidivism that their information is excluded from online community notification.

In *Smith*, the high court reasoned that because sex offender registration imposes a relatively "minor" burden, "the State can dispense with individual predictions of future dangerousness" without casting into doubt the nonpunitive character of the regulatory scheme. (*Smith*, *supra*, 538 U.S. at p. 104.) By contrast, when a statute imposes a severe restraint such as involuntary commitment, "[t]he magnitude of the restraint ma[kes] individual assessment appropriate." (*Ibid.*) Though less onerous than involuntary commitment, section 3003.5(b)'s residency restriction is more onerous than registration. It is sufficiently onerous that "a lack of individual assessment," which attenuates the nexus to a regulatory purpose, "render[s] the statute punitive." (*Baker*, *supra*, 295 S.W.3d at p. 446.)

The excessiveness of the residency restriction in relation to its nonpunitive purpose is reinforced by findings of the California Sex Offender Management Board (Board). Created in 2005 by bipartisan legislation (Stats. 2006, ch. 338), the Board is the state entity within the Department of Corrections and

20

Rehabilitation charged with "address[ing] any issues, concerns, and problems related to the community management of adult sex offenders." (§ 9002, subd. (a); see *ibid.* ["The main objective of the board . . . is to achieve safer communities by reducing victimization."].) In a 2011 report, the Board concluded: "Based on all that is known about sex offender recidivism and about the nature of most sex offenses involving children, there is no evidence that residence restrictions are related to preventing or deterring sex crimes against children. To the contrary, the evidence strongly suggests that residence restrictions are likely to have the unintended effect of increasing the likelihood of sexual re-offense." (2011 Update, *supra*, at p. 1.) According to the Board, residency restrictions like section 3003.5(b) are ineffective because most sex crimes against children are perpetrated not by strangers lurking near schools or parks, but by family members or acquaintances who victimize children inside their homes or other private settings. (2011 Update, at pp. 9–13.) At the same time, by limiting sex offenders' access to housing and, in turn, employment, health care, transportation, and rehabilitative services, residency restrictions often result in "an unstable lifestyle" that "represents a major risk factor for re-offending." (*Id.* at p. 14.) These general findings, like the recidivism data cited in *Smith* and in today's opinion, properly inform whether the statute is punitive in effect. (See maj. opn., *ante*, at p. 32, quoting *Smith*, *supra*, 538 U.S. at p. 103 [relying on secondary sources]; *Smith*, at p. 104 [same]; but cf. maj. opn., *ante*, at p. 24, fn. 12 [criticizing my reliance on secondary sources].)

To be sure, "[t]he excessiveness inquiry . . . is not an exercise in determining whether the legislature has made the best choice possible to address the problem it seeks to remedy." (*Smith*, *supra*, 538 U.S. at p. 105.) Even so, section 3003.5(b) is sweeping and indiscriminate "in its necessary operation"

21

(*Smith*, at p. 97) and imposes significant disabilities and restraints that scarcely further the statute's protective purpose, if at all. Section 3003.5(b)'s residency restriction, though regulatory in intent, is punitive in effect.

This conclusion, in the context of an *Apprendi* claim, does not mean the residency restriction cannot validly be imposed on persons who are subject to registration under section 290.006. But it does mean the facts authorizing imposition of the restriction must be proven to a jury beyond a reasonable doubt. In this case, the residency restriction is "a penalty *exceeding* the maximum [Mosley] would receive if punished according to the facts reflected in the jury verdict alone." (*Apprendi*, *supra*, 530 U.S. at p. 483.) Accordingly, I respectfully dissent from today's decision upholding the imposition of the residency restriction on Mosley.

Because the residency restriction is separable from section 290's registration requirements, and because our precedent holds that the registration requirements are not punitive (*Picklesimer*, *supra*, 48 Cal.4th at pp. 343–344), I agree that "the judge-imposed registration order remains separately valid and extant." (Maj. opn., *ante*, at p. 34.) I thus join the court in reversing the Court of Appeal's judgment to the extent it relieved Mosley of the requirement that he register as a sex offender.

**LIU, J.**

**I CONCUR:**

**WERDEGAR, J.**

22

*See next page for addresses and telephone numbers for counsel who argued in Supreme Court.*

**Name of Opinion** People v. Mosley

_____

**Unpublished Opinion**
**Original Appeal**
**Original Proceeding**
**Review Granted** XXX 188 Cal.App.4th 1090
**Rehearing Granted**


_____

**Opinion No.** S187965
**Date Filed:** March 2, 2015

_____

**Court:** Superior
**County:** Orange
**Judge:** David A. Hoffer


_____

**Counsel:**

Allison H. Ting and George L. Schraer, under appointments by the Supreme Court, for Defendant and Appellant.

Stephen P. Lipson, Public Defender (Ventura) and Michael C. McMahon for California Public Defenders Association as Amicus Curiae on behalf of Defendant and Appellant.

Richard Such for California Attorneys for Criminal Justice as Amicus Curiae on behalf of Defendant and Appellant.

Christina Allbright for California Coalition on Sexual Offending and The Association for the Treatment of Sexual Abusers as Amici Curiae on behalf of Defendant and Appellant.

Edmund G. Brown, Jr., and Kamala D. Harris, Attorneys General, Dane R. Gillette, Chief Assistant Attorney General, Gary W. Schons and Michael P. Farrell, Assistant Attorneys General, Donald E. de Nichola, Deputy State Solicitor General, Peter Quon, Jr., Lilia E. Garcia, Angela M. Borzachillo, Catherine Chatman and Janet E. Neeley, Deputy Attorneys General, for Plaintiff and Respondent.

1

**Counsel who argued in Supreme Court (not intended for publication with opinion):**

George L. Schraer
5173 Waring Road, #247
San Diego, CA 92120
(619) 582-6047

Janet E. Neeley
Deputy Attorney General
1300 I Street, Suite 125
Sacramento, CA 94244-2550
(916) 324-5257